First case on our call this morning is Agenda No. 1, Case No. 104-443, People v. Lawrence Lovejoy. Good morning, Your Honors. Tim Fawcett for Lawrence Lovejoy. With the Court's permission, I propose to argue Issues 1 and 2 of my brief this morning, which is the denial of the defense motion to reopen the proofs, along with the continuance that preceded that motion. This trial came to an end on February 2nd, a Friday, as to the evidence. The case was going to be argued on the following Tuesday, which was the next court date. It would be arguments and submitted to the jury, as it was. The defense moved to continue their case to closing of their case until Tuesday, and they made that motion at the end of the day Friday. There had been four defense witnesses who testified on Friday afternoon, but their testimony is not particularly pertinent to this issue. The testimony that's pertinent is the Thursday afternoon testimony of Tamara Camp, who was the state's DNA expert, and she identified certain areas on the bathroom tile that had DNA on it and some other testimony. The defense... Could you stop it there, just to clarify something for me? Was that testimony listed by the state in direct response to a question? Did the witness offer this as an explanation to or embellishment of the testimony? The witness's testimony on direct examination went into the area of saying that she had done the three swabs, one at the edge, where there was under the threshold, and two at the center. And she said, it was apparent blood everywhere. It was all one stain everywhere. And the prosecutor... This is on direct before any cross. And the prosecutor said, well, what about here? And what about here? And what about here? She said, yes, yes, yes, it's all apparent blood. It's all one stain. That was on direct examination, and that was... When you say here, here, and here, was that to the three separate swabs? That was... B1, B2, or... Well, it's hard to say. I think he was referring to the blurry print, the clear print in the center, and then over on the white strip on the side, that area, too. So I wasn't there, and I don't see what he said. It's hard to read from the record what he said. But this is at page 6402 is her opinion. And from my notes, she says, it's apparent blood on the tile was consistent with originating from Erin. So then the state's attorney asked about the center portion. She said, well, it's all one stain. This is 6402 over the 6403. And the area of ridge detail identified by Mr. Keith, meaning the prominent area compared between my client's left foot. And she said, again, it's apparent blood, which is consistent with having originated from Erin. And the state's attorney then reiterated that this area, and this area, and this area, and the center of the diagram is all one stain. Yes. And she repeated, all one stain. Was her report admitted in the record in this case? The report is in the record. I don't think the report itself came into evidence, but the language of it was read. This is an impeachment by omission, isn't that correct? Isn't that what we're dealing with here? We're talking about – And I think, if I'm wrong, you can tell me, at least it appears to be the apparent blood is the impeachment by omission. It's misleading affirmatively in the report, where she says in the report, the item was swabbed and had a limited portion was negative for blood. That's in the report. That's exactly the language on her November 4th report. Which you maintain is different than apparent blood. Well, the judge said so. The judge said so on the first time that the trial defense lawyers objected. The judge said on February 1st, well, I think it's fair cross-examination. I think it's fair cross-examination, the judge said, because it's different. And this is what the judge said. I can have just a minute. She said it twice. But it's certainly fair cross-examination that she never put the exact conclusion that she made in this courtroom in a report, page 6432. That's an impeachment by omission. Well, there's that and there's more. I agree she omitted that conclusion. And the judge said it's fair to say she omitted that conclusion. But it was affirmatively misleading because if she had only said there's DNA at the center of the tile, that's one thing. But it's the combination of saying there is a negative preliminary presumptive test for blood and there's DNA in the center of the tile. Do we know which swab that was? 10B1. 10B2 is in the freezer. We haven't tested it. 10B3 is the swab on the white area. This is a purple and white tile. The apparent print. Well, the 10B3 is, no, the 10B3 is a small reddish-brown stain under the threshold. It was tested. It's got an unknown male DNA and it's got an unknown, it's got inter-injustices DNA. That's one or two, I'm sorry. That's 10B3. Three. Which swab has the print in it? 10B1. And what she said was I swabbed, if you look at the picture, there's a ruler. And you see swabbed near the center of the ruler around three or four inches marks in there. And she said that was a darker area where it was darker purple. So I swabbed in there. I didn't want to swab on the print Mr. Keith identified, that quarter-sized item. I wanted to swab next to it. So I swabbed next to it and I put this aqua purple substance on it and it came back nothing. Whereas over here under the threshold it turned bright aqua blue. Well, if the test turns bright aqua blue, the test she was using, that is a presumptive test, preliminary test that shows blood. It indicates blood. And then she went further and did DNA testing and found these two different things. The 10B1 swab is the one that is negative because it didn't turn aqua blue. Can you explain to us your theory of how this evidence could benefit your case, the evidence that was not permitted into evidence? The motion that was made Monday afternoon had a proffer. And we said, Judge, we've been telling you for the last two court dates we want to get this expert. Well, I got an expert now. And it's Dr. Carl Reich and his proffer is in the motion. And he says, number one, the test that was used by Ms. Kemp is a very sensitive test. So if it came up negative, that's very strong evidence that there was not blood at that spot. And number two, her explanation, which she was allowed to do. I'm sorry. I don't want you to get lost, but I'd like to find my way. What was the inference that you would draw from that favorable to your client, that there wasn't blood at that spot? See, we say that print has been there preexisting the murder. We're not disputing. We're not conceding. We're not disputing. We just say they have a print. The guy says he's 100% certain that's my client's left foot. We say, so what? He had the run of the house for two weeks, five days a week. There was an opinion rendered by a technician of some kind that the print was made from stepping into the blood that was there on the floor. Isn't that accurate? Well, both people, everyone on the state's side says that that print was made Saturday morning or after the murder at the cleanup or wherever. And you can argue whether the foot kicked up blood someplace else and stepped on a clean area and deposited the print, or you can argue whether it was a foot stepping in the blood. I think Ms. Camp's testimony is it was a foot stepping in the blood, but that's the reason she said it's all one area and everything there is a footprint in blood. So the whole, and I don't mean to belittle it at all, and I'm not, the whole purpose of your claims here is that that print may not have been made the morning of the crime but may have been made at an earlier time. Exactly. It's a pre-existing print, and I can tell you exactly how. Well, I can't tell you exactly how, but here's my, I would reason what happened. Valerie, the mother and wife, goes to work early. Aaron goes to school earlier than Mr. Lovejoy arrived from his night job. He's working the midnight shift. He gets off at seven in the morning. He comes home and gets the key to the house, the townhouse, for which he's a co-owner, but he's not living there at the time. Valerie said you can stay there during the day. He gets the key, opens the door, goes inside, has the run of the house for the day, takes a shower, takes a nap, makes a sandwich. Is there evidence that he took a shower? He had the run of the house for the day is the evidence. Beyond that, I don't know. There is evidence that he was in the shower. You're drawing an inference that if you have the run of the house, you might take a shower. If I worked at Caterpillar as a painter, I'd be taking a shower when I got home from work. That's my inference. But there's a positive direct evidence that he was in the bathtub changing the shower head. And I would add, and Valerie testified to that, and I would add that even back a long time ago when my father used to turn off the lights in the house, he gets home from working the night shift, Aaron's gone to school and left the light on, you can see somebody would step into the bathroom, left foot stepped in, reach over, turn the light off, step back out on his way. He just happens to be barefoot when he did it. I mean, it could have happened that way. That's a good inference. That's a state's inference that he had to have made a key. He had to have made a key to get in because there was no forced entry. Maybe she opened the door. We don't know. Maybe somebody else came in. Maybe it wasn't him. As Mr. Miller argued to the jury, there's a lot of maybes in this case. What we're saying is that this footprint evidence is convicting evidence if it was made that morning because it's at least part of the cleanup. Even if he was not the hands-on killer, he was there as the cleanup. We have to show that footprint was not made that Saturday morning. We're attempting to do that. And the way that the trial lawyers tried to do that was to say, look, Tamara Camps, their DNA expert, she says this negative presumptive test for blood at the center of the tile, we know the test didn't fail because it worked over here under the threshold. So what we got is good evidence for the defense, no blood at the center of the tile. That's step one. I want to go back to something that you said earlier because I'm still trying to understand this scene. Did you say that the print that was available and was the basis of the comparison was the size of a quarter? That's my understanding from the record. It was part of the foot. It wasn't the whole foot. There isn't actually a whole foot print in one complete whole footprint. If you look at the before picture, it's splotchy with red and brown splotchy areas. There's white areas, too. But there was a cleanup attempt, apparently. And there's just like the ball amount of the foot and part of the big toe, and it's pointing like 45-degree angle out the bathroom. My explanation is he steps across the threshold and turns the light off. Aaron left the light on. Maybe it happened. But that's what they got. They got a 45-degree angle foot with the ball amount of the foot, and that's it. And that's a quarter size. And on that quarter size, they found ridge impressions. There was testimony, and I'm certain that you would question it, that if the print had been there before, it would have been smudged by the blood that came out in the day of the crime. That's one piece of testimony by Mr. Keith says that. And, you know, it's not so clear. I mean, he says that if you drop blood directly on it, it would obliterate the print. And if you wash over, if you have a wave action, the bloody water in the bathtub for which blood broke down, you know, there was one argument as to whether that could reach the print. He said a wash over would obliterate the print. But he said he got prints off of cars that have sat out overnight in the rain. And look at the autopsy doctor who said her wrists were cut and she was spurting blood. Every beat of her heart. Terrible testimony, but that's what he said. Both wrists, both arteries were cut, the ulnar and the radial, one or the other wrist. And that blood was out. And hopefully she passed out very quickly after that. But that could convince a jury that there was splash, there was spatter, there was spray. Mr. Miller argued there was spray to the jury. But he said, you know, we don't know everything that happened, of course, but the fact that blood could have gotten on that print is why the LC violet test turned purple. Mr. Fossett, the defendant knew prior to trial, didn't he, that the state intended to argue the inference that the defendant's footprint was made in Erin's blood? Absolutely, Your Honor. And so back to your issues one and two, I mean, the trial judge did make the comment, right, that the defendant certainly had the right and ability to get a counter expert prior to trial, right? Yes, that was one of the basis of the trial court's rulings. Right. And while we're on the basis of the rulings, is the state right that abuse of discretion would apply with respect to the continuance and the calling of the defense expert? I think so. That's the standard review that I think I put in my brief as well. So back to where Justice Fitzgerald started his question relating to the apparent, the words apparent, Camp's testimony with respect to apparent blood, could you infer from Camp's report that you did have that she found blood was presumptively present or not? Only on the margin, what I call the margin, which is the threshold. The report said negative for blood on swab 10B1, which is the center area swab. So where are we in light of that abuse of discretion? In light of that, that's new and damaging testimony that should have allowed for the continuance and at least reopening the case with a defense expert? Is that your position? I'm just trying to understand your position. It's worse because after she said it's apparent testimony in all one's stain, then the defense objected and they had this colloquy where the court said, I think it's fair cross and fair to redirect. So on redirect, she said, well, I can explain it. Sure, it's a negative presumptive test for blood at this 10B1 swab at the center of the tile, but the agent absorbed all the heme, which is the hemoglobin, which is the word they've been using in this trial, the heme, H-E-M-E. All the heme got used up. Now, I know she's not a Ph.D. in molecular biology like my expert is. My expert says that's backwards. Now, the problem is he says the heme is a catalyst, and the reagents get used up. The heme is recycled. So there should be heme if there's blood. It's the problem of negative presumptive tests for blood at the center of the tile and Aaron's DNA at the center of the tile. Where did the DNA come from? The state says – I just want to make sure I understand you, okay? The LCV, according to you, would not have used the blood up but would have enhanced it. Is that what you're saying? Well, the LCV is the purple stuff. The blue aqua TMB, it's tetranethylbenzidine. It's the blue aqua stuff that she put on. She said the violet used up the heme, so my blue aqua stuff couldn't work where it's purple. You see, this testimony looks at this tile and says, it's purple over here, it's white over there, my test worked over there, my test didn't work here. What's the problem? And you know what? The jury's going to look at that and say, oh, yeah, that's the ah-ha moment. Ah-ha, sure, no problem. And what we wanted to say is, no, that's wrong. We just wanted to have call a witness to say, we are surprised by this. It's inconsistent with the report, as the judge said. We have a reliance interest, as Mr. Burkett said, they anticipated. I see a judge on the 5th of February, he said they anticipated using her testimony. No problem with that. So all we want to do is call this expert, and this expert has made a proffer, and it's Monday afternoon. If we couldn't go on Tuesday, we could go on Wednesday. I don't know why on this record they couldn't have gone on Tuesday. I don't want to address that. But we have a guy who can come in and say, that's wrong, that the heme got used up. That's bad science. And he's a Ph.D. in molecular biology, and he's in Hillside. So I think that what we wanted to do is show that we could put a football-sized hole in the window of their case. I'm referring, of course, to People v. Rafer. But until this testimony, Mr. Fawcett, there was, in the defendant's point of view, no need for an expert to counter Camp's testimony? Well, this is a difficult question because defense says, Judge, we knew from the get-go that they were going to say a footprint in blood. I mean, there was a press release in August 19th or 20th. We knew they were saying, defendant's footprint in the bathroom in blood. The problem is the evidence they were using to prove that. We knew the print guy was going to come in, but we have their DNA expert on this presumptive negative test for blood. There is no blood at the center. The DNA is touched DNA. It fell off. It's epidermis. It doesn't have to be from blood. The state's brief says, well, it's got to be from body fluids. It doesn't have to be from blood. Remember the breast swab? There were two different profiles on her left breast. One was my client's, maybe from his hand, maybe from saliva. We don't know. The second profile could not come back to anybody. Where did it come from? She took a bath. It came from the towel. Her mother folded the towels. Who knows where it came from? There was some unknown DNA. It's touched DNA. All through this trial, we established that DNA could be picked up by laying on the bedsheets, by shaking hands. So our argument was we got DNA at the center of this tile that is the victim's, but it's not necessarily from any body fluid. And the state's own expert says it's a negative presumptive test for blood. And they said it in their opening statement. Back to Justice Thomas's point, though, the thing that, if this is true, the thing that was missing from the report was the effect of the LCV on, the potential effect of the LCV on blood. Well, she didn't say it was all one stain, and she didn't say that her presumptive test was a false negative because of the LCV test. So if she had said, she could have filed a second report and said, I now come to the conclusion that my November 4th report fails to tell you that my aqua purple test was a false negative. I got a false negative at the center. She had said that to the defense, but said, oh, my God, we've got to go and get an expert. But they thought it was not a false negative, and they didn't know she was going to say it was a false negative until she hit the stand and testified about it. And she didn't use the word false negative. That's my words, but that's what it is. She's saying, look, the heme got all used up because Dabney, with the evidence tech, put the LCV on it. And they could have got an expert, I suppose. You can always get an expert. They did get an expert, a print expert, in 2005, but they didn't get a DNA expert. How do the discovery rules play into this? For example, with respect to the expert, right, whether it's a new opinion, it's questions that were either asked or could have been asked, right? So you've just presented the defense theory of the case. I mean, certainly you were capable at the time of deposition, right, with respect to Camp to say, you know, what about this? You know, what about this? And then Camp may have answered. Well, the whole heme and apparent blood thing would have come out. So is it, in light of that, still a discovery violation? Well, I agree. It appears that no one did depositions, and I suppose they could have. It may have been, I don't know, it may have been the decision of the defense was, this is pretty good. Let's go with it. Now, say that they have the burden of saying, this is your opinion in a written report. Do we have to look behind it, or can we depend upon the state to make the correction of its own error, if it's an error? And it seems to me that if you're talking about a formal discovery opinion by an expert, the expert should qualify their opinion in writing if they need to qualify the opinion, especially a false negative. Was that opinion even needed until the defense theory of the case was furthered? Well, I think the beginning, the direct examination before any cross was that it was apparent blood all in one stain, and the defense never thought there was apparent blood in the center of the tile. And, of course, if it's apparent blood in the center of the tile, at least Ms. Kampf's testimony seems to cover all the bases and say Leroy Keith's quarter-sized print was, Lovejoy's print made that Saturday morning, which is easier to say if it's a foot that's stepping in the blood, whereas, you know, Mr. Keith said, well, it was just a clear spot on the tile, and he must have stepped in some blood elsewhere and then on his way out the door left a print on the way out the door. So Ms. Kampf's testimony is more damaging yet than anything else in the case. She was February 1st, Thursday. Is any of that quarter-sized spot in the print itself? The print that I'm talking about is a partial print, and it's the quarter size. They say Leroy Keith said it was the ball mound of the left foot underneath the left big toe, and that was all they got. They didn't get the whole left big toe or they didn't get the rest of the foot, but it's a quarter size with clear ridges from that area of the left foot. So, you know, this is very damaging testimony, and we had a way to meet it that was taken out from under us. We had a state's witness give testimony that was 180 degrees opposite of what we thought she was going to say, and while we could have done depositions and while we could have gone out and got the extra expert, time and money is precious in a case this size. I can only say it's my impression, and I know both of the lawyers. I don't know Mr. Miller, but I know both of the lawyers. I haven't interviewed them on this. My impression only is that they thought they had something pretty good to stand on, and that was their defense. They were going to use that, he said on the record. We planned on using that to undermine Mr. Keith's testimony, and where they were going was it was an innocent footprint preexisting because he had the run of the house. So our whole defense collapsed when we couldn't bring in the Ph.D. expert who was available Friday or Monday afternoon, whom the state talked to on the telephone, I presume, whom they knew what he was going to say, whom they had a line of cross-examination. They said, Judge, he said he would do a DNA test, too. You know, you do a DNA test, it doesn't tell you what the source of the material is. It tells you it's a human being or somebody else, something else. It doesn't tell you what the source material is. In all the rape cases I've seen, you can eyeball the sperm cells in the microscope first, and you know what you're working with, but if you just got DNA that you got off a swab, you don't know what the source of the skin cell is. It could be an epithelial cell falling off. So our defense was really, really harmed by this testimony that we say, whether it's a discovery violation or not, we just wanted to call the expert. And I was starting to talk about the Rayford case in the Fifth District. You know, it's an old case. It's the one where the lady said the man came up, the defendant came up to the kitchen window and shot his rifle through the window. Shot my friend in the hip. Fortunately, she survived. Small hole in the window. They picked a jury. They're going to do opening statements. Deputy Jack Price, hero to the defense, said, if that guy had been standing by the kitchen window and shot his rifle through there, there'd be a hole in that window the size of a football. Well, he was not let in to testify, and the appellate court reversed under the theory of there's a right to present a defense, and that was crucial evidence. So all we're saying is that we have a right to present a defense. We have the witness. There was no prejudice to the state. There was no prejudice at all. The only thing they could say was, well, you know, we don't have a rebuttal witness handy. Well, okay, they don't have a Ph.D. rebuttal witness handy, but they got DNA people at their county lab who are county employees, some of whom testified in this case. If you want to take another day and delay the trial from the 6th, which is Tuesday, to the 7th, which is Wednesday, it probably would have been sufficient time for them to bring in another witness. They didn't need another rebuttal witness. They had their cross-examination. They knew what was going to be said. There was absolutely no prejudice to them, and our case was hurt beyond measure by not being able to call a Ph.D. molecular biologist to refute. The heme was all used up, and he would have refuted it, and he would have said it was a very powerful test in and of itself indicates that there was no blood. Well, I just want to conclude by saying that there's really not much point in talking about Issue 2, which is the continuance issue, but there would have been no harm in delaying the resting. There was some additional harm if we had the reopen, but we didn't get the witness in. It's not a fair trial, and I'd ask the court to send this case back for a retrial, and maybe we'll get Dr. Wike on the witness stand then. I guess I've concluded. If there's any questions, Your Honor, thank you very much for your attention. May it please the Court, my name is Erin O'Connell. On behalf of the people of the State of Illinois, the defendant is really splitting hairs here with respect to this footprint evidence. I want to step back a little bit and just put forth what the people's case was surrounding this evidence. The first point to just keep in mind is that the victim is found in a bloody bathtub. She's in a bathroom that is covered everywhere with her own blood, reddish brown. We can just infer from the fact that she's sliced through four major arteries that this is all the victim's blood. The people found, through their evidence technician, a bathroom tile that had this ridge detail. I want to make clear that there was one footprint. There's not a clear print and a blurry print. There was one print. A portion of it was clear enough to be identified. The other portion was blurry. The testimony is on page 6541 of the record where Leroy Keith says he talks about this blurry point and he says it was his opinion that this was part of the footprint, but the amount of contaminant was so high, there was so much blood on that portion that it deposited too much to leave a clear detail. So this is all one footprint. Do you know whether 10B1 came off of that footprint or alongside it, away from the footprint? It was in the blurry portion of the footprint. And just to be clear as to what 10B3 related to, on the tile there was this ridge impression and this blurry footprint that all turned purple when it was treated with LCV. There was a portion that was under a strip on the threshold of the door, and it was on that portion that there was still a reddish blood, I mean, you know, a reddish blood area, blood type, color that hadn't been treated yet. So this explains why this TMB test reacted positively to this portion, but it didn't react positively if you can believe Tamara Kahn's explanation. Which was the portion underneath the little sill there? Right. That hadn't yet been treated with the LCV. So there was a portion that was purple that contained the footprint, and then there was a portion that hadn't yet been treated but was still on the tile. So she treated that with the TMB and that reacted positively. But everything that was purple, it was that portion when she swabbed it that didn't react to her TMB test. However, it did show that there was DNA present that belonged to the victim. The fair inference here, given the amount of blood that was in the area and the fact that this blood right by it was, you know, positively identified to be blood, was that this DNA came from the victim's blood cells. So there was a single print. Okay. On the footprint, I thought the expert said that it is possible or apparently blood. I don't understand what that means. It wasn't established it was actually blood? I don't think it can be. There are two tests that are used by law enforcement that are presumptive tests for the presence of blood. So this is the LCV and the TMB. They're two different tests that are usually used. And so when it reacts positively to one of those tests, then it's presumptively blood. And so, as in this case, they remove the tile to be further examined. I don't think that it can be said that it's actually blood until there's been some sort of a DNA analysis. So then there would be the combination of, well, it reacted positively to the test and I found DNA, so this is probably blood. So I think that's how it feels. Are you okay with the position of the defense that DNA exists separately from the fluid that it was once carried in? Well, it has to be present in some form of body cell. And so the question in this case is, well, where could this DNA in this swab have come from? We know certain facts that tend to indicate that it was the victim's blood. The fact that this was a bathroom that was absolutely covered in her blood, the fact that this stain started out when it was first observed being reddish brown by the evidence technician, the fact that it reacted to the LCV test, all of this points to it being the victim's blood. Let me ask this question of you. Would it be fair for the defense, and they don't need my help, but would it be fair to them to say that's a fine argument, it's one you'd expect to make if I got my evidence in, but I really think I'm entitled to my evidence so that the jury can choose between what I'm saying and what the state's saying? In other words, you're giving some arguments that some may think are compelling against the position of the defense, but the defense says we're still entitled to our position. And the defense did argue that they impeached Tamara Camp by omission. They pointed out again and again this negative result. I think that the problem with their theory is that they've never articulated what this could be other than blood. And the defense theory, still when counsel was up here, he didn't articulate very clearly what this could be. So we know, it's uncontested that there was a footprint that was made visible by some substance. Defendant has put forth a theory that this was a preexisting footprint. I just want to say, I want to point to some testimony in the record. There was a single print expert. This is the only testimony that appears, and it is unequivocal that that is an absolute impossibility. Defense counsel tried repeatedly to try to get a concession that, well, this could have been a preexisting print that was made visible by blood that appeared later on. On page 6543, the witness said that if a liquid of any sort would flow over a preexisting, naturally occurring latent print, if it didn't destroy the print, it would obliterate it and prevent any sort of development technique from making it appear with the sort of clarity that this Ridge impression had. He also, on page 6766. Is that the same as what you just said about, did you say obliterated? Right. Would it make it blurry? Yes. So how is that defeating to what the defense counsel has just indicated? Well, he has to explain why there was a clear print. No one ever tried to match the blurry print to anyone because it couldn't be done. He has to explain why there was a clear portion that could be compared and positively with 100 percent certainty matched to his own print. And so the print expert testified repeatedly that it would be impossible for there to be some sort of a, you know, skin transfer of his cells onto the surface that would then become visible later on. So that theory, I mean, he has never put forth an explanation that is supported by evidence in the record that could establish what this reddish brown substance would be that was making this print visible. And that's what I'm arguing is the natural inference, and the only one that's supported by the record is that this was, in fact, from blood. I also just want to make a couple of other things clear on this footprint argument. In the reply brief, defendant suggests that there is some sort of an inconsistency in the people's testimony with respect to a different point. And that is where he talks about there being a positive print and a negative print. The only testimony, and this was by the print expert, was that he said that he was sure that he was looking at a positive print impression. This is on page 6719. Tamara Camp never made any sort of statement as to whether this was positive or whether this was negative. That wasn't her area of expertise. I would just note that on page one of the reply brief where he makes this assertion, he provides no record site and I was not able to find anything in the record that would support this apparent contradiction in the people's testimony. And then on the final point, so the expert that defendant tendered in his motion to reopen the proofs said two things. He said first that this TMB test is much more sensitive than the LCB test. This is something that defense counsel could have and should have gotten before trial if this was an argument that he wanted to make, that this was somehow much more probative evidence that this wasn't blood than the people's evidence that it was blood. So this portion of his expert testimony should not be considered as part of his argument that this was responding to new testimony. And then the second part of the expert's testimony that he wanted to present was intended to contradict Tamara Camp's theoretical explanation for why the TMB would react negatively. I would just like to point out that there were three state witnesses, all of whom testified that this was a positive footprint made by the defendant in the victim's blood. Tamara Camp, her testimony was largely in terms of the overall context that she did a DNA test and confirmed that this was from the victim, that the DNA was present. However, the print expert and also the evidence technician who saw this print in its original form both testified, I think, very strongly that this print was made in the victim's blood at the time of the murder, which really makes this evidence very immaterial in the course of the trial. Unless the court has further questions on the footprint, I'd like to move on. Go ahead. Okay, I was going to move on to the motive evidence put forth by the people. All of this evidence was in fact admitted as motive evidence and it was admissible for that purpose. There was a series, the record can be a little bit confusing because there was a series of motions and rulings that took place on this evidence. Actually, the first motion that was brought was the people's motion to declare a declaration of the right to confront. So there was litigation on that before there was even really any evidence that was linked to that that was really at issue. And then the second stage was motions in limine pertaining to hearsay rules. Those were ruled on separately and the court expressly stated that it was ruling on the merits of the hearsay arguments. Before trial, there were two competing motions. The people's motion to admit this as other crimes evidence relative to, I mean, relevant to show motive. Defendant's motion to preclude all evidence of the rape as overly prejudicial. The court's final ruling on this issue was that the evidence would be admissible to prove motive. And the court encouraged and the defendant obtained an appropriate limiting instruction that was read to the jury before this evidence was put in and then it was also read in the final jury instructions. So all of this was admitted to prove motive. As such, the hearsay arguments don't really come into play. However, with respect to the hearsay, it should be noted that the vast majority of the rape-related evidence was not even arguably hearsay. Most of it was given in other forms that didn't involve out-of-court statements of the victim. In terms of the key testimony that would be potentially hearsay and was extremely significant for proving the people's case was the victim's own statement, which set forth the details of what had occurred. Defendant has argued over and over that this wasn't necessary. However, it was absolutely essential to providing the context for the physical evidence, which so strongly corroborated the victim's allegations. So it was based on her sequence of events that it became her testimony that he brought massage oil, for example, was made highly significant by the fact that the detectives that went to the apartment were not aware of this. So this additional physical evidence was brought before the jury, demonstrating how highly credible her allegations were that this defendant was facing a near-certain conviction for rape, especially given the DNA evidence that ultimately came out that it was his DNA on her breast. I mean, her statement says that it was his saliva, the substance that's present in saliva, amylase, was found on the breast in addition to the defendant's DNA. This is strong evidence that this got there through the misconduct that the victim alleged. You indicate on page 50 of your brief that Melendez-Diaz will not be dispositive. I think that's being argued in the U.S. Supreme Court this morning. And you seem to distinguish that on the basis that the issue here is really whether these reports are non-testimonial business records, as opposed to establishing whether or not, in fact, it was a drug or a substance. Right. Could you expound on that, please? Well, first, I would say that we're not entirely opposed to this court deferring a ruling until Melendez-Diaz comes down, because regardless of whether it's relevant, it's not going to be, it shouldn't be negative for our position. The distinction that I've drawn is Melendez-Diaz deals with a case in which a police-run laboratory was involved in a crime. And there was a statute in Massachusetts that allows this as prima facie evidence that it was, in fact, drug contraband. The tester, no expert actually needs to come to court to verify this. And, in fact, this court faced a really similar situation in the case of McClanahan. There was an Illinois statute that was very similar. This is different in a number of ways. First, this is not even evidence that was presented to establish the fact of the toxicity levels. This was evidence that an expert introduced by way of explaining and supporting his opinion that the victim had been poisoned with lethal quantities of cold medication. So this was actually non-hearsay evidence that was reported to the jury. Counsel, if I may, is it your position that the toxicological evidence was limited to the Wilson v. Clark opinion that the witness testified to in court? Is that your position? The Wilson v. Clark opinion. 703, 705, the evidence upon which he based his opinion. Yes, it was put forth as... I just want to test that a little bit, if I can. Sure. What the toxicological report revealed was that there were toxins taken from the body that were consistent with the cold medicine. Is that correct? Yes. And was the toxicologist here a public employee or a private employee? No. Well, it was a private laboratory that, as I understand it, received in the ordinary course samples that were taken during autopsies. And autopsies are distinct from criminal investigations. Whoever this person was, he wasn't a person that was working at a crime lab for the government somewhere. No. And also, it was admitted as just evidence to support his conclusion, because it was not the only basis for the autopsy expert to conclude that this victim had been poisoned with liquid cold medication. It obviously was strong support for that. Even if you were to decide the first issue against you, would you suggest that it would be harmless error because of the facts you've just revealed? Yes. And under a number of other theories as well, I would argue that this is harmless error. And perhaps I should take this opportunity to set forth what I think is the big picture here. And if this court were to find in defendant's favor on any of the arguments that he's raising, it would still be harmless error beyond a reasonable doubt. The evidence that linked this defendant to this crime was simply overwhelming. The first key piece of evidence was the defendant's obvious motive here. He had raped the victim, and she had brought accusations three weeks before her murder, and while the DNA test results that would ultimately confirm his guilt were still pending. There is the fact that he has demonstrated an exceptional level of callousness toward the victim. This can be seen in his videotaped statement, which was taken the day after the murder. Not only was he rather strangely emotionless with respect to her, but also he failed at any point to comfort his wife for this extraordinarily traumatic event. We have his admission to being at the scene of the crime at 7.30 a.m. that morning. We know that the neighbors overheard noises at 8.30 a.m. that took place around the time that would have been near the end of Erin Justice's life. We know that he had no legitimate reason for being there. In his statement, he can put forth no credible argument. He says that he went there at 7.30 a.m. to pick up a dog for a 12.30 p.m. veterinary appointment. He clearly knew that Erin Justice would be there at that time. He knew that she would be alone. He knew that her mother had specifically instructed him to not have any contact with her at all during the pendency of this rape investigation, yet he went there for no credible reason. Finally, the forensic evidence here is compelling. The footprint evidence, when it's considered along with all the other evidence, this is a unique identifier of the defendant. He can be identified with 100 percent certainty. Indeed, as defense counsel conceded, this was extremely problematic evidence for the defendant. This was a print that was made in the victim's blood as the state's witnesses testified repeatedly, which indicates not only that the victim's blood was not the defendant's, but that he was there at the time of her death in the bathroom where her body was found. So the evidence here is extremely compelling, and the state's case did not turn on any one piece of the evidence that's being contested by the defendant. And now I'm going to actually move on and just make a comment about the admission of the defendant's statement. We set forth a number of theories in our brief as to why this evidence is admissible. The first is that the Terry stop that took place was within a proper scope. I just want to note in the reply brief that the defendant seems to believe that this turns on whether the defendant's choice as to the location of the interview, whether that was coerced, that that is a dispositive issue. I just want to assume for a moment that he's correct. Let's assume that he did think that he had no choice but to move the interview to the police station. When he got to the police station, he met privately with his defense counsel, and counsel not only informed him that he could remain silent, but strongly encouraged him that he should remain silent. And this was a factual finding that the trial court made based on the credibility of the defense counsel and the defendant. And that's on page 1777 of the record. He met with his counsel, went against his counsel's advice and gave his statement. Regardless of whether he believed he had to be at the police station, he certainly knew he didn't have to give a statement at that point. And that here is the relevant question. I believe I have covered all of the issues that I wanted to bring up. If the court has no further questions, then I'll complete my argument. Thank you. Counsel. Your Honor, I'm scheduled to be at a training session in Springfield next week. I'll be happy to come back and argue all the issues that the court is interested in. But time is short, so let me quickly just say that on the Fourth Amendment issue, I thought the issue was Fourth Amendment taint, not voluntariness of the statement. It's a tough issue, but remember the officer held the keys, didn't give him back his van keys, went to the van, got the keys. Didn't he drive to the police station? He did. It's a good theory, but it's thin, but it's there. That's really the point. It's not that he made a voluntary statement. It's that the decisions that were made were made at the time the officer was holding on to his car keys. And I cited case law, a couple of cases with parallel facts, which have said that the consent gained in that moment is invalid consent. Now, it's not whether it's a volunteer, whether he did things after that with the advice of counsel or voluntarily. I think the hot button issue in the case is attenuation because of counsel's presence. But it's not true to say voluntary statement, that's be all and the end all. It's a coerced statement because of Fourth Amendment theory, not Fifth Amendment theory. Now, on the Melendez-Diaz case, I commend to you the brief by Professor Richard Friedman, which you can obtain online. I only read it Saturday morning and had time to supplement it, and I thought we probably overburdened with all of this anyway. I'll wait until the opinion comes down, see what it says. But Professor Friedman's position, if I may refer to it, because it is online and reachable by everybody, is that the toxicology report would be testimonial. Now, what does it say? Is it Wilson v. Clark? Well, you know, what it says is that you look at the photograph of the large colon, it's blue-green. You say, as a doctor, as an MD, an autopsy doctor, I eyeball that. I think that she drank a lot of cough medicine. And I know I read in the Tribune about young teenagers drinking cough medicine to get high, but she drank a lot of cough medicine. It was a lethal dose. He can't say without the toxicology report. So the toxicology report tells him. Now, is that pure Wilson v. Clark, or is that the difference between she was poisoned versus she was poisoned by a lethal amount? And his opinion was she would have died by a lethal amount. So I say, Wilson v. Clark, yeah, she was poisoned. And the testimonial analysis, does it make any difference that he's not a public employee? I don't think so. Again, I commend Professor Friedman's view, and I was reading Davis this morning, Davis v. Washington, you know, brought it with me, in fact, but there's that language about the young girl who runs out of a rape scene and runs home. And so by the time she got home, she was making a report of past events. And it's language right in Davis v. Washington. In the same way, this is a private lab contractor. They're making a report of what the numbers are. You know, if you like nanograms, I learned 1,000 nanograms are a microgram, and 1,000 micrograms are one milligram. But the doctor said, on the one hand, she's poisoned, Wilson v. Clark. And on the other hand, it was lethal. It would have killed her eventually. This is testimonial. Wilson v. Clark is not. That's my argument. I got a lot of ground to cover because she raised a lot of issues I didn't talk about. When you get to all the hearsay questions in the case, and there's a lot of them, the statement to Mrs. Bankhead is testimonial because she was in a place of safety, just like the case I just cited, the old 1779 case in Davis. The statement to the police officers is testimonial because Mrs. Bankhead said, I'm going to call the police. All those statements were admitted as hearsay except the written statement, which was admitted as non-hearsay motive. It was such non-hearsay motive that in the rebuttal argument, the prosecutor stood up and said, we proved he raped her beyond a reason. Without your bet, we proved it. We proved every last thing about it. Mr. Burkett at the beginning of the trial said, we want all the details. We want to prove the truth of it. You know, they didn't care whether this was motive evidence or not. They had their motive evidence from sexual contact. They didn't need sexual penetration. Answer me this. Why did she tell the nurse that she was kissed on the left breast when she told three officers she was kissed on both breasts? Why did she say that? I don't know the answer. I can't figure it out. There's absolutely no reason why she would lie. She made a lucky guess. She better say something because the nurse was asking her, where were you touched? Well, she better say the left breast. She goes, Mr. Miller said in her statement, this is their evidence, he's supposed to have touched her breast while he's giving her a massage. And she said, Lawrence, stop. And then he did. And then he lifted up her shirt and put his hands on her breast again. And so if she did lie to the police, and how would I know? If she did lie to the police about everything else, including the kissing on the breast, there was a hand on the breast. What about the amylase? Well, Doug Saul, the DNA guy, the other DNA guy they could have called, said amylase, it's a toss-up. It's 50-50. You could argue that there was no saliva on her breast, just as well as you could argue that there was saliva on her breast. So they get to argue there was saliva. We get to say it was a hand. As Mr. Miller argued through the jury, a lot of maybes in this case. The garage door shut before anything else happened. Did she say, now I got him? When she changed out of her junior men's top and short, short bottoms and put on a new T-shirt and her Levi's, went to the door and she said, Lawrence gave me a hug and a kiss and said, I love you. I don't want to hurt you. Are you mad at me? Yeah, I'm mad at you. Why are you mad at me? What you did to me. What did she do? What did he do? And the jury question is, what did he do to her? And she went down the hall and down the street. She's in a point of safety when she left. She's at a point of safety when she comes in. She had plenty of time to invent a sexual penetration case. It's not that hard for a 16-year-old girl to invent that. Could it happen? I don't know. A lot of questions for the jury here. And I think we go back to the footprint evidence. The footprint evidence was devastating. We argued innocence here. Now, they took away our defense. They did 180 degrees opposite of what their expert said. Maybe we should have anticipated that. But it was the choice to go with the defense and say, cannot be blood. And Doug Saul's testimony. I brought it. Give me a minute, please. Doug Saul is the supervisor at DuPage County Crime Lab. And he's talking about the rose plate with the glove and the red-brown stains on the rose plate. He says he's asked about DNA testing. And he had done that. And had DNA testing been done and DNA gotten detected, that would have supported the presumptive positive for blood, would it not? And he said, I'm not sure what you mean by supported. He said, well, indicated that the presumptive test was correct. Answer, whether or not a sample has DNA or is blood are two separate questions. Page 6334. So what they want to do is lower the burden of proof and say, all we've got to do is eyeball red and brown stuff. We want to say it's blood. If we've got DNA there, then it's probably blood. We've got a body in the bathtub. What more do we need? It's a compelling jury argument. But who safeguards the innocent? And who protects from bad science? That's really the question today. So there is no truth that this evidence is harmless error. This was devastating evidence. And if the jury had the aha moment, they didn't think of anything else. This is worse than the motive evidence, which, as Mr. Miller said, we had to defend the entire rape case. In this case, this is worse. This is worse. If that's his footprint in blood that Saturday morning, then they're going to convict him. They don't need to look at anything else. We had our defense eviscerated. Whether it was wise or not, that may be a question for another day, for the lawyers to choose to do that. But they had a defense. They didn't go into battle without something, and it was taken away. And all he said, judge, if we've got a witness who says that's a football through a picture window, we want to be able to bring that witness in. And guess what? He's right here, and they've already talked to him. Tomorrow morning, if not tomorrow morning, then Thursday morning, they said no. That's not fair. And that's as simple as it can be. And there should be a new trial where Lawrence loves me. I'll come back on Monday if you want me to. Thank you. Thank you, counsel. Case number 104443.